MICHAEL KAYE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaye v. Commissioner
Docket No. 6346-72.
United States Tax Court
T.C. Memo 1974-111; 1974 Tax Ct. Memo LEXIS 207; 33 T.C.M. (CCH) 553; T.C.M. (RIA) 74111; May 6, 1974, Filed. Harvey J. Eger and Julian Ruslander, for the petitioner. David W. Otto, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: Respondent determined a deficiency of $3,755.69 in petitioner's 1970 income tax. The only question remaining for decision is whether certain of petitioner's expenditures during 1970 are deductible as "traveling expenses * * * while away from home" within the meaning of section 162(a) (2). [1]
FINDINGS OF FACT Some of the facts have been *208 stipulated and are found accordingly. Petitioner, an unmarried individual, is a citizen of Ireland and a resident alien while living in the United States. For the taxable year 1970, petitioner filed his Federal income tax return with the district director of internal revenue, St. Louis, Missouri. When he filed his petition herein, petitioner resided in Cincinnati, Ohio. Petitioner was born in Dublin, Ireland, where his mother, sister, and brothers continue to live. He graduated from college in 1962 and has since worked as an instrument engineer specializing in calculating and designing the automatic control systems used in chemical and petroleum refining operations. Shortly after arriving in the United States in early 1964, petitioner accepted employment with the Ralph M. Parsons Company in Los Angeles, California. Petitioner worked there for approximately two-and-one-half years before leaving to go into contract work. Contract work pays at a higher rate than permanent employment and is characterized by work on individual projects. Engineers such as petitioner are hired to work on a particular project and when their aspect of that project is completed their employment *209 is ended. After leaving Los Angeles, petitioner decided to establish himself in the Denver, Colorado, area because he believed that that area presented good employment prospects for the future. He, and others in the industry, believed the development of shale oil resources in the Rocky Mountain region was imminent and he felt that he could benefit from this. Denver, Colorado, has three firms which engage in refinery construction. With these expectations in mind, petitioner began a project for the Stearns Rodgers Corporation in Denver in September 1966. This project ended four months later and petitioner's employment with Stearns Rodgers was terminated. He thereafter sought, but was unable to obtain, employment with other contractors engaged in refinery construction in the Denver area. Next, he contacted potential employers in that area in related fields who might have needed his services but was equally unsuccessful. Unable to find work in the Denver area, petitioner contracted, in January 1967, with the Cabot Corporation of Pampa, Texas, to calculate and write specifications for the automatic control equipment required in a carbon black plant. While in Texas, petitioner *210 maintained contact with people at Stearns Rodgers so he would know about any work which became available in Denver. Such an opportunity presented itself in March 1967 and, though the Texas project was still in progress and petitioner expected it to last three more months, he left to return to the Denver area and Stearns Rodgers. Petitioner completed work on the Stearns Rodgers project in September 1967 and, once again, was unable to obtain a contract in the Denver area. Petitioner then obtained a contract with Proctor & Gamble Company in Cincinnati, Ohio, beginning in October 1967. While this project was still in progress, petitioner terminated his contract in November 1967 to return to Denver where an opening with Stearns Rodgers had just become available. The Stearns Rodgers project terminated in April 1968 and, again unable to find work in the Denver area, petitioner decided to take a vacation and visit his family in Dublin, Ireland. Petitioner returned to the United States in January 1969 to accept a work assignment with Monsanto Chemical Corp. (Monsanto). Both Monsanto's corporate headquarters and petitioner's supervisor were located in St. Louis, Missouri. In January *211 1969, petitioner began working for Monsanto on an Arocol plant. Work on this project was performed principally in St. Louis, with some on-site work required. When petitioner completed his work on the Arocol plant, Monsanto offered him a new contract to work on the design and construction of a plant to produce the drug Vanillin. Subsequent to completing this second Monsanto contract, petitioner was offered a third and then a fourth contract to work on additional Vanillin plants.While petitioner was working on these four contracts for Monsanto from January 1969 through January 1971, his home office was in St. Louis but he spent considerable time at the various plant construction sites in Anniston, Alabama, Nitro, West Virginia, and Seattle, Washington. Petitioner's detailed whereabouts while he worked for Monsanto are as follows: Period
Location January 1969 [2]
St. Louis, Missouri
May 1969
Anniston, Alabama
June 1969
St. Louis, Missouri
January 1, 1970
Anniston, Alabama
January 17, 1970
Nitro, West Virginia
February 3, 1970
Anniston, Alabama
February 17, 1970
St. Louis, Missouri
March 1, 19070
Anniston, Alabama
March 9, 1970
St. Louis, Missouri
March 19, 1970 (4 days)
Golden, Colorado [3]
March 23, 1970 (enroute)
Bozeman, Montana
March 24, 1970
Seattle, Washington
June 12, 1970 (weekend)
Golden, Colorado
June 15, 1970
Seattle, Washington
July 24, 1970 (weekend)
Golden, Colorado
July 27, 1970
Seattle, Washington
August 12, 1970 (6 days enroute)
Golden, Colorado
August 18, 1970
St. Louis, Missouri
September 4, 1970 (weekend)
Golden, Colorado
September 8, 1970
St. Louis, Missouri
October 5, 1970
Nitro, West Virginia
October 23, 1970
St. Louis, Missouri
October 29, 1970 (weekend)
Golden, Colorado
November 2, 1970
St. Louis, Missouri
November 6, 1970 (enroute weekend)
Golden, Colorado
November 9, 1970
Seattle, Washington
November 21, 1970
St. Louis, Missouri
November 25, 1970 (Thanksgiving)
Golden, Colorado
November 29, 1970
St. Louis, Missouri
December 23, 1970 (Christmas)
Golden, Colorado
December 27, 1970
St. Louis, Missouri
December 31, 1970 (New Year's)
Golden, Colorado
*212 Thus, during the taxable year in issue, petitioner spent the following amounts of time at each location: Seattle, Washington
143 days
St. Louis, Missouri
109 days
Golden, Colorado
42 days
Anniston, Alabama
38 days
Nitro, West Virginia
33 days
Total
365 days
Petitioner was away from Golden for 323 days in 1970 and claims his expenses on these days as expenses incurred while "away from home." The parties have stipulated that petitioner incurred expenses of $25 per day while traveling in 1970. Petitioner has not worked in the Denver area since April 1968. In November 1966, two months after beginning his first contract with Stearns Rodgers, petitioner purchased a new, eight-room, tri-level house in Golden, Colorado, which has greatly increased in value since then. The house was fully carpeted, draped, and equipped with a stove when petitioner purchased it and he has since added a refrigerator, bed, dinette set, two easy chairs, and a couch. The house contains *213 six rooms on the upper two levels and two on the basement level. Of the two rooms on the basement level, one is arranged as a bedroom and the other as a living room. While working in Texas and Ohio in 1967, petitioner locked the house and left it vacant, but prior to going to Ireland in April 1968 petitioner rented the house for twelve months to friends who were awaiting completion of construction on their new house. The friends did not stay the full twelve months. The house has not been rented since January 1969, but petitioner was willing to rent it in both 1969 and 1970; hence, he deducted on Schedule E of his 1970 income tax return all expenses he incurred with respect to the house except payments on the mortgage principal. [4]
When he rented the house, petitioner moved most of his furniture to the basement, where it has remained. When petitioner was in Golden in 1969 and 1970, he stayed in the basement area but made use of the entire house because there are no bathroom or cooking facilities (except a hot plate) in the basement. Since April 1968, petitioner has also used the basement area to store many of *214 his possessions, including books, periodicals, test equipment, clothing, etc. Petitioner has a valuable gun collection which he places for safekeeping with a friend in Golden. When petitioner arrived in St. Louis in January 1969, he took a month-to-month lease on a one-room apartment which he retained until leaving for Seattle in March 1970. During the time he rented the apartment, petitioner was working out of St. Louis but traveling to start-ups in Anniston, Alabama, and Nitro, West Virginia. While at a start-up site, he left personal belongings such as books, periodicals, test equipment, etc., in the apartment and would return there when his presence at the start-up site was not needed. The apartment was furnished and equipped with a stove, refrigerator, and separate bathroom and was somewhat smaller than the basement of the Golden house. In 1970, all of the petitioner's paychecks were mailed to him in Anniston, St. Louis, or Seattle. He maintained checking accounts in St. Louis, Seattle, and Denver and had a Self-Employed Retirment Plan for which a Denver bank acted as trustee during 1970. He also maintained a stock brokerage account with Dean Witter & Co., Inc., of *215 Denver during that year. He filed no state income tax return anywhere for 1970 and his car bore Alabama license plates in that year.Petitioner attends church every Sunday wherever he is and makes cash contributions in the collection plate. In 1970, he contributed to churches in Golden, St. Louis, and Seattle. ULTIMATE FINDING OF FACT During 1970, petitioner's home was neither in Golden, Colorado, nor in St. Louis, Missouri. OPINION This case requires us again to grapple with the troublesome question of the interpretation of the clause "while away from home in the pursuit of a trade or business" contained in section 162(a) (2). The confounding quality of the word "home" (see Whitman v. United States, 248 F. Supp. 845, 847 (W.D. La. 1965)), is reflected in the continuing dispute as to whether, for tax purposes, it means "place of abode" or "business headquarters" or, in some cases, the place where the taxpayer "happens to be." Compare Six v. United States, 450 F.2d 66 (C.A. 2, 1971), and Rosenspan v. United States, 438 F.2d 905 (C.A. 2, 1971), with Markey v. Commissioner, F.2d (C.A. 6, 1974) reversing T.C. Memo. 1972-154; *216 see Andrzej T. Wirth, 61 T.C. (Mar. 28, 1974). An examination of the decided cases makes it "apparent that neither reconciliation nor deduction of a universally applicable rule is possible." See Whitman v. United States, supra, 248 F. Supp. at 850.In view of the absence of precise guidelines, the ultimate decision is a factual one. See Truman C. Tucker, 55 T.C. 783, 786 (1971). Petitioner contends that his "home" for tax purposes during 1970 was Golden, or, alternatively, St. Louis. Respondent, conceding that each of petitioner's various employment assignments was temporary in nature, asserts that petitioner "carried his home on his back." See Kenneth H. Hicks, 47 T.C. 71, 73 (1966). There is no doubt that, all things being equal, if petitioner could have found employment in Denver, that is where he wanted to live. The question is whether this fact, particularly when coupled with petitioner's previous employment in the Denver area and his ownership of residential property in Golden during the taxable year, is sufficient to justify a decision in his favor. We think not. We see no purpose to be served in dissecting all of the nuances *217 of the decided cases - which, more likely than not, would further confound the quality of the word "home" - or in regurgitating the elements involved in the instant case, all of which are set forth in detail in our findings of fact. We have no doubt that if it were not for the two particular elements previously noted, petitioner would clearly fall within the ambit of those cases which deny a deduction for traveling expenses where the taxpayer has no established residence or principal place of employment. E.g., Rosenspan v. United States, supra; Scotten v. Commissioner, 391 F.2d 274 (C.A. 5, 1968), affirming per curiam T.C. Memo. 1966-206; Carmen Chimento, 52 T.C. 1067 (1969), affirmed per curiam, 438 F.2d 643 (C.A. 3, 1971); Kenneth H. Hicks, supra. Accordingly, we turn our attention to those two elements. Conceivably, in earlier years, Golden may have been petitioner's home for tax purposes. But petitioner has not been employed in the Denver area since April 1968. Subsequent to that date and throughout the taxable year at issue, petitioner was engaged in a series of temporary work assignments, returning *218 to Golden only for a few days on isolated occasions in the course of traveling between places where he worked or for holiday weekends. To be sure, he still harbored hopes of finding work opportunities in the Denver area, but, as far as the record herein is concerned, they were nonexistent or, at best, bleak. [5] Such hopes standing alone are insufficient. Cf. Whitman v. United States, supra; Andrzej T. Wirth, supra; Truman C. Tucker, supra, 55 T.C. at 787. With respect to petitioner's ownership of residential property in Golden during the taxable year in question, we are of the opinion that this factor is also insufficient to tip the scales in petitioner's favor. Whitman v. United States, supra; cf. Scotten v. Commissioner, supra.[6] Indeed, on the record herein, it seems to us that by 1970 the residential property had been converted either into property held for the production of income and/or a vacation *219 spot. In declining to tip the scales in petitioner's favor because of his ownership of such residential property, we recognize the difficulties inherent in petitioner's status as an unmarried person (cf. Irvin M. Sapson, 49 T.C. 636, 643-644 (1968)), but we have been careful to posit our conclusion on the totality of the factors involved and not upon the basis of any rationale that would necessarily produce a different conclusion if petitioner had had a wife or other family remaining in Golden. Cf. Moritz v. Commissioner, 469 F.2d 466 (C.A. 10, 1972), reversing 55 T.C. 113 (1970). In sum, on the basis of the entire record herein, we are satisfied that Golden was at most the place where petitioner's heart lay. As far as petitioner's alternative contention is concerned, petitioner's contacts with St. Louis in 1970 were so insubstantial as to preclude any possibility of considering that his home for tax purposes was in that city. To put it in a nutshell, we hold that such home was where petitioner happened to be *220 (see Andrzej T. Wirth, supra ). In thus concluding, we find it unnecessary to enter the definitional jungle in order to determine whether "home," as used in section 162(a) (2), should, under the circumstances of this case, be the taxpayer's "place of abode" or "business headquarters." Compare Six v. United States, supra, and Rosenspan v. United States, supra, with Markey v. Commissioner, supra.
Decision will be entered for the respondent. Footnotes
1. Unless otherwise specified, all section references shall refer to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue. ↩
2. Petitioner remained in the place indicated until his arrival at the next listed location. ↩
3. Golden is located in the Denver area and is where petitioner claims his "home" was located. ↩
4. The validity of this deduction is not an issue herein. ↩
5. The record is utterly devoid of any evidence as to any specific efforts on the part of petitioner to develop any such opportunity subsequent to 1968. Compare Douglas A. Mazzotta, T.C. Memo. 1971-227↩. 6. Compare also Vincent P. McKilligan, T.C. Memo, 1968-211; Tenney V. Osburn, T.C. Memo. 1958-63↩.